IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| DEANNA ALLEN-McGUIRE, | ) | |
| | ) | CASE NO. 5:13-CV-1494 |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| | ) | KENNETH S. McHARGH |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | **MEMORANDUM OPINION &** |
| | ) | **ORDER** |
| Defendant. | ) | |

This case is before the Magistrate Judge pursuant to the consent of the parties. (Doc. 17). The issue before the undersigned is whether the final decision of the Commissioner of Social Security ("Commissioner") denying Plaintiff Deanna Allen-McGuire's ("Plaintiff") application for a Period of Disability and Disability Insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 416(i) and 423, is supported by substantial evidence and, therefore, conclusive.

For the reasons set forth below, the Court AFFIRMS the Commissioner's decision.

## I.  PROCEDURAL HISTORY

Plaintiff protectively filed an application for Disability Insurance benefits on May 22, 2009. (Tr. 189-97).  At the time of the application, Plaintiff alleged she became disabled on June 1, 2007 due to suffering from migraine headaches, which Plaintiff later supplemented with additional conditions. (Tr. 216).   The Social Security Administration denied Plaintiff's application on initial review and upon reconsideration. (Tr. 146-52).

At Plaintiff's request, administrative law judge ("ALJ") Robert King convened an administrative hearing on September 15, 2011 to evaluate her application. (Tr. 93-134). Plaintiff, represented by counsel, appeared and testified before the ALJ. (*Id*). A vocational expert ("VE"), Mary Beth Kopar, also appeared and testified. (*Id.*).

On October 28, 2011, the ALJ issued an unfavorable decision, finding Plaintiff was not disabled. (Tr. 71-87). After applying the five-step sequential analysis,[1] the ALJ determined Plaintiff retained the ability to perform work existing in significant numbers in the national economy. (*Id.*). Subsequently, Plaintiff requested review of the ALJ's decision from the Appeals Council. (Tr. 65). The Appeals Council denied the request for review, making the ALJ's

---

[1] The Social Security Administration regulations require an ALJ to follow a five-step sequential analysis in making a determination as to "disability." *See* 20 C.F.R. §§ 404.1520(a), 416.920(a). The Sixth Circuit has summarized the five steps as follows:

(1)     If a claimant is doing substantial gainful activity–i.e., working for profit–she is not disabled.

(2)     If a claimant is not doing substantial gainful activity, her impairment must be severe before she can be found to be disabled.

(3)     If a claimant is not doing substantial gainful activity and is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and her impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

(4)     If a claimant's impairment does not prevent her from doing her past relevant work, she is not disabled.

(5)     Even if a claimant's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that accommodates her residual functional capacity and vocational factors (age, education, skills, etc.), she is not disabled.

*Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990); *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001).

October 28, 2011 determination the final decision of the Commissioner. (Tr. 3-9).  Plaintiff now

seeks judicial review of the Commissioner's final decision pursuant to 42 U.S.C. § 405(g).

## II.  EVIDENCE

### A.  Personal Background Information

Plaintiff was born on July 16, 1961, and was 50 years old on the date the ALJ rendered

his decision, making her "closely approaching advanced age." 20 C.F.R. § 404.1563(d).  Plaintiff

completed high school and has past relevant work as an assembler, packager, tire molder,

assembly supervisor, material handler, and phone repairer. (Tr. 124-25).

### B.  Medical Evidence

#### 1.  Physical Impairments

On September 16, 2006, Plaintiff visited the emergency room due to a week-long

intermittent headache that had worsened in the last two days. (Tr. 606-07).  Plaintiff reported

experiencing extensive migraines in the past, but had not experienced one for approximately

three years. (Tr. 606).  Plaintiff was diagnosed with acute cephalgia. (*Id.*).  Plaintiff visited the

emergency room again for acute cephalgia on September 21, 2007. (Tr. 604).  She was given

Compazine, Benadryl, and Toradol, and felt much improved thereafter. (*Id.*).

On October 5, 2007, Plaintiff presented to the emergency room complaining of pain in

her neck, back, and right knee. (Tr. 289-303).  Plaintiff reported that she had fallen down stairs,

causing the injuries. (Tr. 291).  Images were taken of the right knee, which a radiologist

interpreted as showing mild to moderate degenerative joint disease ("DJD"). (*Id.*).  Upon

physical examination, Plaintiff had tenderness in the right knee, but no effusion, swelling, or

deformity. (*Id.*).

In May 2008, Plaintiff underwent a physical examination. (Tr. 325-26).  She reported mild (one to two days per week) pain in her right knee, but had no issue with daily activity. (Tr. 325).  On June 7, 2008, Plaintiff presented to the emergency room with complaints of headaches and nausea. (Tr. 570-76).  She was prescribed medication. (Tr. 574).

While seeking treatment at the Community Health Center ("CHC") for drug dependencies, which will be discussed later herein, Plaintiff spoke to Charlene Kovach, L.I.C.D.C., Q.M.S.H., about her headaches.  On March 4, 2009, Plaintiff reported to Ms. Kovach that her headaches took everything out of her and she was planning to see doctors to have neurological testing performed. (Tr. 529).  Ms. Kovach reported that Plaintiff had rarely been in attendance for her substance abuse therapy meetings. (*Id.*).

On April 28, 2009, Plaintiff reported to Ms. Kovach that her headaches decreased her motivation and caused her to want to "lay around all day." (Tr. 529).  Ms. Kovach encouraged her to exercise five days each week. (*Id.*).  On May 21, 2009, Plaintiff stated she still experienced headaches, but not on a daily basis. (Tr. 529).  She expressed concern to Ms. Kovach that if she started working, it could interfere with her husband's disability benefits. (*Id.*).  Plaintiff confessed to Ms. Kovach that she found herself unmotivated and felt it was because she had no job or obligations, and, as a result, she "lays around a lot and has difficulty getting up in the morning." (*Id.*).  Yet, in June 2009, Plaintiff indicated she experienced headaches three times per week and hoped to obtain medical benefits so that she could receive treatment.  (Tr. 497-98).  She indicated that headaches prevented her from gainful employment because they became so painful that they forced to her lie down. (Tr. 496).

4

On July 17, 2009, Plaintiff told Ms. Kovach that she had a busy and active week. (Tr. 494).  She performed banquet work, in the form of decorating and cleaning up. (*Id.*). Plaintiff indicated "it has actually felt good to be busy," and her headaches were not as frequent. (*Id.*).

On July 23, 2009, Plaintiff underwent a consultative physical examination with state agency physician Vimal Patel, M.D. (Tr. 380-81).  Plaintiff stated that she had experienced migraine headaches two to three times per week her entire life. (Tr. 380).  While Plaintiff had not had a CT-scan, she reported that numerous neurologists had been unable to identify the cause of her migraines.  Plaintiff stated she was able to perform her activities of daily living, sit or stand for two hours at a time for a total of eight hours, and lift up to ten pounds. (*Id.*).  Upon physical examination, Plaintiff showed decreased range of motion in her shoulders and knees, but her gait was normal. (Tr. 381).  Dr. Patel recommended the following: "Pending results of x-rays obtained, claimant would benefit from seeing an orthopedic surgeon vs. medical management with physical therapy for these issues.  She would also benefit from possibly seeing another neurologist to attempt better control of her migraines." (*Id.*).  As to Plaintiff's limitations, Dr. Patel opined, "I believe these debilitating migraines cause difficulty with her being employed; however, if she were able to get better control of this issue, she would be able to perform a desk job." (*Id.*).

On July 23, 2009, Plaintiff reported to Ms. Kovach that she experienced regular headaches. (Tr. 493).  Plaintiff claimed that she could not work any job on a regular basis because no employer would allow her to consistently miss work due to headaches. (*Id.*).

Plaintiff's July 23, 2009 x-rays showed mild degenerative change in the right knee, particularly prominent at the patellofemoral articulation. (Tr. 382). The left shoulder showed the glenohumeral joint intact. (*Id.*).

On September 16, 2009, Cindi Hill, M.D., a state agency consultant, performed a review of Plaintiff's file. (Tr. 427-35). Dr. Hill opined that Plaintiff could perform medium work, with additional limitations on climbing and overhead reaching. (Tr. 428-30). In support of her findings, Dr. Hill explained that Plaintiff's allegations exceeded the support of the objective findings in the medical evidence of record, and Plaintiff presented herself as more limited at the consultative examination with Dr. Patel than at her visits with her treating sources. (Tr. 432).

On November 4, 2009, Plaintiff appeared to her appointment with Ms. Kovach one hour late. (Tr. 487). She reported having "horrendous headaches," which she attributed to stress, having recently found out that her father had cancer. (*Id.*). On December 7, 2009, Ms. Kovach talked to Plaintiff about a recent relapse of substance abuse and headaches. (Tr. 484). Ms. Kovach opined that the headaches were likely a result of using drugs. (*Id.*). On January 19, 2010, Plaintiff left a message for Ms. Kovach that she was not feeling well due to headaches and could not make her individual or group therapy sessions. (Tr. 471). Ms. Kovach indicated that this seemed to be Plaintiff's "method of operation." (*Id.*). On February 8, 2010, Ms. Kovach explained that she realized Plaintiff did suffer from headaches, but it appeared that she used this "to her advantage." (Tr. 468).

On March 8, 2010, Plaintiff began treating with Gina Horne, an internal medicine specialist. (Tr. 664-68). A physical examination showed Plaintiff had a full range of motion in the right knee, but some decreased strength in the left shoulder with lifting the arm. (Tr. 667). Otherwise her physical examination was unremarkable, including her neurological findings.

(*Id.*).  Plaintiff reported undergoing rotator cuff repair around 1995 and having pain off and on in her shoulder, particularly when lying down. (Tr. 669).  Dr. Horne's impressions were chronic migraines, chronic sinusitis, right knee pain, left shoulder pain, depression, and fatigue. (Tr. 668).  Dr. Horne noted that Plaintiff had not seen a physician in over one year. (Tr. 669). Plaintiff continued to treat with Dr. Horne during the relevant period for headaches, sinusitis, rotator cuff syndrome, low back pain, and depression, among other alleged symptoms. (Tr. 643-63).

On April 10, 2010, Plaintiff presented to the emergency room due to a continuous headache that lasted six weeks. (Tr. 567). A CT scan was performed, which returned negative, and additional lab work also returned normal. (*Id.*). Plaintiff was treated with Compazine, Toradol, and Benadryl, which significantly reduced her pain.  Gary Giorgio, M.D., was unable to identify the etiology of Plaintiff's chronic headaches, but instructed her to follow up with Dr. Horne and consult a neurologist or headache specialist. (*Id.*).

On April 22, 2010, state agency consultant Jerry McCloud, M.D., performed a second review of the record. (Tr. 506).  Dr. McCloud affirmed Dr. Hill's physical residual functional capacity recommendation. (*Id.*).

On April 23, 2010, Ms. Kovach described Plaintiff as "very worn and somewhat dazed." (Tr. 510).  Plaintiff believed her migraine medication was not working, but making the situation worse, so that she was groggy, unable to drive, and unable to leave her home most days. (*Id.*). On April 27, 2010, Plaintiff reported to Ms. Kovach that she had blackout periods, during which she could not remember what had occurred, but her doctor was investigating the cause. (Tr. 509).

Plaintiff returned to the emergency room on April 28, 2010, again with migraine symptoms and explaining that she was unhappy with Dr. Horne's treatment of her migraines.

(Tr. 565).  Although Plaintiff denied consuming alcohol, her blood alcohol level was 0.18 and her speech was slurred.  Plaintiff was treated with medication and discharged with diagnoses of migraine headaches and alcohol abuse. (*Id.*).

An x-ray taken of Plaintiff's knee in September 2010 showed mild degenerative changes. (Tr. 640).  A November 2010 MRI of Plaintiff's left shoulder showed degenerative findings with spurring, geode formation, and labral irregularity. (Tr. 642).  There was also fluid within the subacromial space and moderate to severe supraspinatus with milder infraspinatus and subscapularis tendinopathy. (*Id.*).

On December 2, 2010, Dr. Horne adjusted Plaintiff's migraine medications, increasing her dosage of Topamax. (Tr. 653).  Plaintiff described her headaches as occurring five to six times per week and being of variable types, lasting for hours to days without relief. (Tr. 654).  Plaintiff stated that the headaches were of such severity that they restricted her ability to work and complete home responsibilities. (*Id.*).

On December 8, 2010, Plaintiff presented to Kenneth Mooney, M.D., for an evaluation of sinus headaches. (Tr. 625).  Dr. Mooney diagnosed headaches, rhinitis, and nasal scarring on the left side. (Tr. 632).  He recommended that Plaintiff follow up with a neurologist for her headaches, because she was on maximum medication and still having complaints. (*Id.*).  A February 2011 CT of Plaintiff's paranasal sinuses showed moderate to severe paranasal sinus disease. (Tr. 634).  Dr. Mooney prescribed medication, but Plaintiff reported she was unable to fulfill the prescription due to monetary issues. (Tr. 644).

On December 16, 2010, Dr. Horne noted that Plaintiff had seen an orthopedist for her shoulder and knee. (Tr. 651).  Plaintiff had been referred to physical therapy, but had not yet attended.  She indicated that a cortisone injection was very helpful for her shoulder and allowed

her to sleep through the night. (*Id.*).  Plaintiff stated that the increase in Topamax had not improved her headaches, which remained essentially unchanged.  Dr. Horne commented that Plaintiff had not been keeping a headache diary. (*Id.*).

On September 21, 2011, Plaintiff began treating with orthopedist Nilesh Shah, M.D. (Tr. 747-48).  She complained of shoulder pain, worse on the left, occurring with all activities, particularly reaching overhead.  Plaintiff stated that the cortisone shot she received in December was not helpful.  Plaintiff also reported knee pain, worse on the left, which increased when climbing stairs, walking, and lying down.  Plaintiff's physical examination showed a normal gait. She experienced some knee pain during palpation and at the end ranges of extension.  Dr. Shah noted a patella grin.  Plaintiff's left shoulder showed normal range of motion, but there was significantly decreased abduction and severely limited internal rotation. Her left shoulder strength was normal, but there was pain with resisted internal and external rotation and forward flexion.  Plaintiff's right shoulder had a normal range of motion, except for mildly limited full abduction and internal rotation.  Her right shoulder strength was normal and without pain. (*Id.*).

Dr. Shah examined x-rays of Plaintiff's knees, which he opined demonstrated mild to moderate narrowing of the medial compartment bilaterally, severe patellofemoral joint degenerative disc disease bilaterally, and some lateralization of the patella bilaterally. (Tr. 749). Dr. Shah aspirated Plaintiff's knees and administrated steroid injections.  The doctor also reviewed a November 2010 MRI of Plaintiff's left shoulder that showed significant tendinopathy and osteoarthritis to the glenohumeral joint and acromioclavicular ("A.C.") joint.  Dr. Shah discussed treatment options for Plaintiff's shoulder, and she indicated she wished to speak to a surgeon. (*Id.*).

Plaintiff returned to see Dr. Shah on October 13, 2011. (Tr. 744-46).  Plaintiff explained that injections provided relief for only a few days in her knees.  Dr. Shah recommended surgical intervention for Plaintiff's knee due to severe patellofemoral arthritis and lack of response to conservative treatment. (Tr. 745).  Plaintiff was to follow-up with Dr. Bell regarding the potential for shoulder surgery. (*Id.*).

### 2.  Mental Impairments & Substance Abuse

In May 2005, Plaintiff began treatment at CHC for opioid and cocaine dependence. (Tr. 317).  Plaintiff reported a history of termination from past employment due to drug use. (*Id.*).  She was admitted for treatment on May 17, 2005.  (Tr. 314).  Her diagnoses upon admission were opioid dependence, cocaine dependence, bipolar disorder, and hepatitis C. (*Id.*).  Plaintiff underwent methadone treatment and received counseling services. (Tr. 314, 318).

An August 2007 psychiatric progress noted described Plaintiff as tidy, coherent, not paranoid or suicidal, and with mildly impaired judgment and cognition. (Tr. 348).  Although Plaintiff was depressed, she behaved in a friendly manner and her substance abuse was noted to be well-controlled on methadone.  On September 10, 2007, Plaintiff stated that she had begun working full-time at Rubbermaid at the beginning of the month. (Tr. 346).  In October 2007, Plaintiff's affect and mood were noted to be "improving." (Tr. 340).  While Plaintiff had mildly impaired insight and judgment, she was alert, coherent, responding well to current medications.  Plaintiff's psychiatric progress notes appear to continue reporting similar mild issues and improvement through February of 2008. (Tr. 330-37).

On March 20, 2008, Ronald Immerman, M.D., performed a psychiatric evaluation. (Tr. 390-93).  Plaintiff reported low moods and irritability on a daily basis, resulting in fractured sleep, racing thoughts, and being easily distracted. (Tr. 390).  She reported passive suicidal

10

ideation and an extensive pattern of abusing drugs from early in her teenage years. (Tr. 390-91). Plaintiff's mental status examination was unremarkable, with Dr. Immerman observing that Plaintiff was pleasant, cooperative, her speech was within normal limits and logical, her mood was "ok," and her affected normal. (Tr. 391).  The doctor diagnosed bipolar disorder, anxiety disorder, cocaine dependence, and opioid dependence (in early remission). (Tr. 392).  He assigned a global assessment of functioning score ("GAF") of 55, representing moderate symptoms. (*Id.*).  Dr. Immerman noted that Plaintiff had not been hospitalized for psychiatric reasons. (Tr. 390).

In May 2008, Kathleen Cockfield, a nurse at Portage Path Behavior Health ("Portage Path"), recounted Plaintiff's report that she was clean and sober, with some decrease in irritability. (Tr. 416).  Plaintiff was excited to be starting a computer class, and her mental status examination was unremarkable, aside from a somewhat depressed mood. (*Id.*).

On August 4, 2008, Nancy Keogh, Ph.D., of CHC explained that Plaintiff had lost her full time job at Rubbermaid because of migraine headaches, illness, and drug use. (Tr. 538). Plaintiff confessed that she had a substance relapse after losing her job.  (*Id.*).  Plaintiff's mental status examination was unremarkable that day. (Tr. 537-38).  Dr. Keogh opined that Plaintiff was stable from opiate use when on methadone, but could not stop using cocaine. (Tr. 538).  The doctor referred Plaintiff to RAMAR, a residential chemical dependency treatment facility. (Tr. 315-16, 538).

Plaintiff treated with Ms. Cockfield on October 30, 2008.  (Tr. 410).  Although Plaintiff was irritable with decreased motivation, she was also smiling, logical, cooperative, alert, and displaying good insight and judgment. (*Id.*).  Plaintiff continued to attend sessions with Ms. Cockfield through 2008, with mostly unremarkable mental status examinations. By January

11

2009, Plaintiff reported that she was feeling less depressed due to an increase in Lamictal, she was almost completely off methadone, and she was in RAMAR after care. (Tr. 405).   In February 2009, Ms. Cockfield observed that Plaintiff was smiling, animated, with a stable mood, and with improving insight and judgment. (Tr. 403).   However, in June 2009, Plaintiff complained of low motivation, depression, and migraines. (Tr. 401).  Ms. Cockfield wrote that Plaintiff appeared tired and depressed, but was cooperative, with intact judgment and a logical thought process. (*Id.*).

On August 26, 2009, Ms. Kovach wrote that Plaintiff was tearful and described verbal abuse from her husband. (Tr. 490).  Plaintiff indicated that Social Security benefits may be the only way for her to get out of her marriage. (*Id.*).  A September 3, 2009 treatment note indicated Plaintiff was depressed and taking Lamictal and Lexapro for mood stabilization. (Tr. 396).

On September 4, 2009, Ms. Cockfield completed a Mental Status Questionnaire, explaining that she had treated Plaintiff from May 2008 through September 2009. (Tr. 422-24). Ms. Cockfield described Plaintiff as having a depressed mood and low motivation, but normal speech.  Additionally, Plaintiff's ability to remember, understand, and follow directions were intact, and she had no deficiencies in social functioning.  Ms. Cockfield indicated that Plaintiff's depressed mood and migraines made functioning difficult. (*Id.*).

On September 22, 2009, David Dietz, Ph.D., a state agency reviewing consultant, performed a review of Plaintiff's file. (Tr. 427-35).  Dr. Dietz concluded that Plaintiff could perform three to four-step tasks in an environment where she did not have to maintain high production demands or schedules. (Tr. 452).

On December 14, 2009, Theresa Wilson, a licensed social worker at CHC, explained that Plaintiff struggled with depression due to her father's recent diagnosis with cancer. (Tr. 480).  A

December 18, 2009 treatment note indicates that Plaintiff stopped taking her anti-depressant medications and recently re-started because she believed they may help with depression. (Tr. 478). On December 28, 2009, Plaintiff told Ms. Kovach that she felt as though she had been in a "tailspin" since she stopped taking Lamictal. (Tr. 476).

On August 4, 2010, Plaintiff underwent a clinical evaluation at Portage Path. (Tr. 670). The report indicates Plaintiff had been absent from treatment at Portage Path since September 2009. (Tr. 682).  Plaintiff stated that when she began having problems with headaches, she stopped taking medication and dropped out of treatment. (*Id.*).  Her mental status examination showed a depressed and anxious mood, but appropriate affect, logical thought process, clear speech, and poor to fair judgment. (Tr. 686).

On May 17, 2010, state agency consultant Bruce Goldsmith, reviewed Plaintiff's updated medical records. (Tr. 577).  He affirmed Dr. Dietz's September 2009 opinion. (*Id.*).

On August 23, 2010, Sameera Khan, M.D., of Portage Path conducted a psychiatric evaluation of Plaintiff. (Tr. 689).  Plaintiff told Dr. Khan that she had a long history of headaches that were not treated by medication, and she could not tolerate the medication.  Plaintiff also described sadness, depression, crying episodes, not wanting to leave bed, low motivation and energy, hopelessness, and anxiousness. (*Id.*).  The mental status examination showed that Plaintiff was alert, with decreased psychomotor activity, coherent speech, fair mood, and no anxiety. (Tr. 690).  Dr. Khan recommended psychopharmacology and psychotherapy treatments and added Wellbutrin to Plaintiff's medication. (Tr. 691).  A treatment note from September 22, 2010 indicates that Plaintiff was only taking half of her Wellbutrin prescription. (Tr. 733).

Plaintiff began missing numerous treatment sessions at Portage Path toward the end of 2010 and into 2011. (Tr. 706-13, 719-22, 724, 732).  On June 29, 2011, Plaintiff treated with Dr.

13

Khan, who indicated he had not seen her since September 2010. (Tr. 699).  Plaintiff reported that she had long-run out run out of medication.  She was tearful and explained that she could not get up to do anything, her insurance had run out, and she was experiencing greater depression. (*Id.*).  Dr. Khan observed that Plaintiff had normal speech, was adequately groomed, had negative thoughts but was non-delusional, heard voices, was depressed and anxious, had impaired judgment, and was cooperative with appropriate eye contact. (*Id.*).  Dr. Khan started Plaintiff on psychotropic medication again. (Tr. 700).  On June 30, 2011 Portage Path treatment notes indicated that Plaintiff recently resumed anti-depressant medication. (Tr. 698).  Plaintiff's medical treatment had stopped when she lost Access to Care eligibility, which was terminated because she had not paid a token fee and re-registered. (*Id.*).

On September 14, 2011, Dr. Khan completed a Medical Source Statement speaking to Plaintiff's mental limitations. (Tr. 741-43).  Dr. Khan opined that Plaintiff suffered from marked to extreme limitations in the following areas:  maintaining concentration and attention for two hour periods; performing activities within a schedule; maintaining regular attendance; sustaining ordinary routine without special supervision; completing a normal workweek without interruption from symptoms and performing at a consistent pace; accepting instructions and responding appropriately to criticism from supervisors; and getting along with coworkers or peers.  Dr. Khan also found that Plaintiff suffered from a number of moderate limitations.

Additionally, Dr. Khan indicated that Plaintiff had suffered from three or more episodes of decompensation within the past 12 months, each of which were at least two weeks in duration.  In support of his assessment, Dr. Khan wrote that Plaintiff exhibited a "markedly poor ability to focus and effectively problem solve," her moods and chronic pain were disruptive, and she had

14

been seen for multiple psychiatric treatment sessions.  The doctor also indicated that previous treatment records were reviewed. (*Id.*).

### III. SUMMARY OF THE ALJ'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1. The claimant last met the insured status requirements of the Social Security Act on December 31, 2012.

2. The claimant did not engage in substantial gainful activity since June 1, 2007, the alleged onset date.

3. The claimant has the following severe impairments:  (1) osteoarthritis of the thoracic spine; (2) degenerative joint disease of both knees; (3) history of right rotator cuff surgery in 1995; (4) osteoarthritis of the left shoulder with rotator cuff syndrome and tendinopathy; (5) history of carpal tunnel syndrome; (5) headaches; (6) paranasal sinus disease and allergic rhinitis; (7) generalized anxiety disorder, poorly documented; (8) depressive disorder, not otherwise specified; and (9) polysubstance abuse and dependence.

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

5. After careful consideration of the entire record, I find that, through the date last insured, the claimant had the residual functional capacity to perform light work as defined in 20 C.F.R. 404.1567(b).  She can lift and/or carry twenty pounds occasionally and ten pounds frequently.  She can stand and/or walk (with normal breaks) for at least six hours in an eight hour workday.  She can sit (with normal breaks) for at least six hours in an eight hour workday.  She has no restriction in her ability to push and/or pull, (including the operation of and or foot controls), other than as restricted by her limitations on lifting/carrying. She can occasionally climb ramps and stairs.  She can occasionally climb ladders, ropes or scaffolds.  She can frequently stoop and can occasionally knee, crouch, and crawl.  She can reach in all directions without restrictions, except that she can only occasionally reach overhead bilaterally.  She can frequently handle and finger bilaterally. She cannot work in extreme cold and she needs to avoid concentrated exposure to substantial noise and vibration.  She needs to avoid concentrated exposure to respiratory irritants such as fumes, odors, dusts, gases, poor ventilation, etc.  Mentally, she is limited to simple, routine, repetitive tasks, involving only simple, work-related decisions and in general, relatively few workplace changes.  She cannot interact with others in situations involving substantial negotiation, persuasion, or conflict resolution. She cannot work in an environment with extremely high quotas, very strict time limits or deadlines, or extremely fast-paced production demands (such as those encountered in piece work or on a fast moving assembly line).

6.  The claimant is unable to perform any past relevant work.

7.  The claimant was born on July 1, 1961 and was 45 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date.

8.  The claimant has at least a high school education and is able to communicate in English.

. . .

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that in significant numbers in the national economy that the claimant can perform.

11. The claimant has not been under a disability, as defined in the Social Security Act, from June 1, 2007, through the date of this decision.

(Tr. 73-87) (internal citations omitted).

## IV. DISABILITY STANDARD

A claimant is entitled to receive Disability Insurance and/or Supplemental Security Income benefits only when she establishes disability within the meaning of the Social Security Act.  *See* 42 U.S.C. §§ 423, 1381.  A claimant is considered disabled when she cannot perform "substantial gainful employment by reason of any medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve (12) months."  *See* 20 C.F.R. §§ 404.1505, 416.905.

## V.  STANDARD OF REVIEW

Judicial review of the Commissioner's benefits decision is limited to a determination of whether, based on the record as a whole, the Commissioner's decision is supported by substantial evidence, and whether, in making that decision, the Commissioner employed the proper legal standards.  *See Cunningham v. Apfel*, 12 F. App'x 361, 362 (6th Cir. 2001); *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984); *Richardson v. Perales*, 402 U.S. 389, 401 (1971). "Substantial evidence" has been defined as more than a scintilla of evidence but less than a preponderance of the evidence.  *See Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524, 535

(6th Cir. 1981).  Thus, if the record evidence is of such a nature that a reasonable mind might accept it as adequate support for the Commissioner's final benefits determination, then that determination must be affirmed. *Id.*

The Commissioner's determination must stand if supported by substantial evidence, regardless of whether this Court would resolve the issues of fact in dispute differently or substantial evidence also supports the opposite conclusion. *See Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983).  This Court may not try the case de novo, resolve conflicts in the evidence, or decide questions of credibility. *See Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).  However, it may examine all the evidence in the record in making its decision, regardless of whether such evidence was cited in the Commissioner's final decision.  *See Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989).

## VI.  ANALYSIS

Plaintiff argues that the ALJ's residual functional capacity ("RFC") assessment is not supported by substantial evidence, because the ALJ failed to appropriately assess a number of opinions issued by medical sources.  For the reasons that follow, Plaintiff's arguments do not warrant reversal or remand.

### A.  Plaintiff's Treating Physician

Plaintiff contends that the ALJ erred in failing to grant controlling weight to the opinion of her treating psychiatrist, Dr. Khan.  Dr. Khan first treated Plaintiff on August 23, 2010.  In September 2011, the doctor completed a medical source statement describing his opinions as to the extent of Plaintiff's mental limitations. (Tr. 741-43)   He opined that Plaintiff suffered from a number of moderate, marked, and extreme limitations. (*Id.*).

When assessing the medical evidence contained within a claimant's file, it is well-established that an ALJ must give special attention to the findings of the claimant's treating source. *See Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004).  The treating source doctrine recognizes that physicians who have a long-standing treating relationship with an individual are better equipped to provide a complete picture of the individual's health and treatment history. *Id.*; 20 C.F.R. § 404.1527(c)(2).  Under the Social Security Regulations, opinions from such physicians are entitled to controlling weight if the opinion (1) "is well-supported by medically acceptable clinical and laboratory diagnostic techniques," and (2) "is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2).

The treating source's opinions are not entitled to such deference, however, if they are unsupported by the medical data in the record, or are inconsistent with the other substantial evidence in the record.  *See Miller v. Sec'y of Health & Human Servs.*, No. 91-1325, 1991 WL 229979, at *2 (6th Cir. Nov. 7, 1991) (Table).  When the treating physician's opinions are not entitled to controlling weight, the ALJ should apply specific factors to determine how much weight to give the opinion.  *Wilson*, 378 F.3d at 544, *see* 20 C.F.R. § 404.1527(c)(2)-(6).  The regulations also advise the ALJ to provide "good reasons" for the weight accorded to the treating source's opinion. 20 C.F.R. § 404.1527(c).  Regardless of how much weight is assigned to the treating physician's opinions, the ALJ retains the power to make the ultimate decision of whether the claimant is disabled.  *Walker v. Sec'y of Health & Human Servs.*, 980 F.2d 1066, 1070 (6th Cir. 1992) (*citing King v. Heckler*, 742 F.2d 968, 973 (6th Cir. 1984)).

In the present case, the ALJ assessed Dr. Khan's medical source statement and attributed "little weight" to the opinions contained therein. (Tr. 83-84).  The ALJ explained that the opinions were inconsistent with the record as a whole and not support by objective evidence

18

regarding the claimant's mental status.  The ALJ also explained that Dr. Khan based his opinion largely on Plaintiff's subjective complaints, which was inappropriate here, because many factors detracted substantially from Plaintiff's overall credibility. (*Id.*).

Plaintiff contends that it was error for the ALJ to reject the medical source statement because it was based on her subjective complaints.  She argues that there is no support for this conclusion.  According to Plaintiff, Dr. Khan based his treating source statement on evidence obtained through the objective process of mental status evaluations and observations by the doctor and other healthcare provides at Portage Path.

It is somewhat unclear whether Dr. Khan based the limitations set forth in the medical source statement primarily on Plaintiff's complaints, because there is no express indication from the doctor that he did so.  Even so, Dr. Khan's treatment notes and others from Portage Path draw into question the extent of the doctor's reliance on Plaintiff's self-reports.  The vast majority of mental healthcare treatment notes show predominantly mild to moderate findings. The most serious symptoms appear to come from Plaintiff's self-reports in June and August 2011 sessions.  As a result, it seems that the ALJ concluded Dr. Khan based his opinions on Plaintiff's subjective complaints.  The ALJ found that Plaintiff was not credible, and provided substantial reasons to support his credibility determination, which Plaintiff does not challenge.

Nonetheless, assuming that the ALJ's analysis is insufficient to comply with the treating source rule, any error in this regard does not necessitate remand.  A violation of the doctrine may be deemed harmless where the ALJ satisfies the goal of the "good reasons" requirement despite failing to adhere to the letter of the regulation.  *Friend v. Comm'r of Soc. Sec.*, 375 F. App'x 543, 551 (6th Cir. 2010) (*quoting* Wilson, 378 F.3d at 547).  "If the ALJ's opinion permits the claimant and a reviewing court a clear understanding of the reasons for the weight given a

treating physician's opinion, strict compliance with the rule may sometimes be excused." *Id*.  In *Nelson v. Comm'r of Soc. Sec.*, 195 F. App'x 462, 470-71 (6th Cir. 2006), the ALJ failed to strictly comply with the mandates of the treating source doctrine.  However, the Sixth Circuit concluded that "the ALJ's evaluation of [the plaintiff's] mental impairments indirectly attacks both the supportability of [the treating physicians'] opinions and the consistency of those opinions with the rest of the record evidence." *Id.* at 470.  Because the ALJ's discussion of the other evidence "implicitly provided sufficient reasons for not giving . . . controlling weight" to the treating physicians, the Sixth Circuit concluded that the ALJ's decision satisfied the purposes of the treating physician rule. *Id.* at 472.

In this case, the ALJ's opinion, taken as a whole, thoroughly evaluates and analyzes the evidence and indicates the weight given.  The ALJ's opinion indirectly attacks the supportability and consistency of Dr. Khan's medical source statement.   As such, the Court has a sufficient basis to understand the ALJ's rationale for assigning little weight to Dr. Khan.

An examination of the ALJ's opinion shows that Dr. Khan's medical source statement findings were inconsistent with and not supported by the record.  For example, Dr. Khan found that Plaintiff had a medically documented history of three episodes of decompensation, each lasting at least two weeks, within a 12 month period. (Tr. 84).  However, the ALJ's thorough discussion of Plaintiff's mental health treatment notes reveals no such episodes (Tr. 80-82), and the Court is unaware of any in the record.  Plaintiff points to no evidence to support such a significant finding by Dr. Khan.  It appears that Plaintiff never suffered from any episodes of decompensation lasting for an extended duration.  Furthermore, as the ALJ noted, Dr. Khan opined Plaintiff had a marked loss in her ability to accept criticism from supervisors and get along with co-workers without distracting those workers. (Tr. 84).   However, the ALJ's

discussion of the evidence shows no support for such a limitation.  As the ALJ observed, Ms. Cockfield found Plaintiff had no deficiencies in social interaction. (Tr. 83).  Again, Plaintiff points to no evidence that would show she had such a serious limitation in getting along with others, would distract co-workers, or struggled to accept criticism from authority figures.

Overall, the ALJ recounted the marked and extreme limitations that Dr. Khan assigned, but mental status evaluations of Plaintiff throughout the relevant period generally reveal mild to moderate findings.  For instance, an August 2007 examination found Plaintiff to display "a tidy appearance, coherent speech, and mild impairments in cognition, insight, and judgment." (Tr. 80).  In February 2009, Plaintiff was well groomed, smiling, and logical, with stable mood and affect. (Tr. 81).  While the ALJ acknowledged that Plaintiff suffered from symptoms and limitations arising out of her impairments, the medical evidence does not support Dr. Khan's serious limitations. The undersigned also notes that a review of the evidence and the ALJ's opinion does not indicate that the ALJ mischaracterized Dr. Khan's opinion or the Portage Path treatment records as Plaintiff alleges.

Plaintiff further contends that by rejecting her treating source's opinion, the ALJ inappropriately substituted his lay opinion for that of a medical professional.  This argument is not well-taken.  The ALJ is not bound by the opinion of a treating physician when that opinion is not well-supported or contradicted by other evidence. *See Miller v. Sec'y of Health & Human Servs.*, No. 91-1325, 1991 WL 229979, at *2 (6th Cir. Nov. 7, 1991) (Table); *c.f. Meece v. Barnhart*, 192 F. App'x 456, 465 (6th Cir. 2006) ("the ALJ may not substitute his own medical judgment for that of the treating physician where the opinion of the treating physician is supported by the medical evidence . . . While the ALJ may have prescribed different pain medication than that prescribed by Plaintiff's doctors, this decision is beyond the expertise of the

ALJ and is not a legitimate basis for an adverse credibility determination.").  In the present case, the ALJ's opinion provided reasonable grounds to devalue the opinion of Dr. Khan and his finding is supported by substantial evidence.  Thus, in accordance with the regulations, the ALJ gave less than controlling weight to the doctor's opinion while formulating the RFC.  The ALJ's actions do not demonstrate that he acted beyond his duties to make medical judgments. Accordingly, Plaintiff's argument lacks merit.

Plaintiff asserts that when the ALJ discounted the various medical opinions in the record, including, but not limited to, her treating psychiatrist, the ALJ failed to devalue the opinions based on the factors set forth in 20 C.F.R. § 404.1527.  Plaintiff implies that the ALJ is required to address each of the factors denoted in the listing when discounting medical opinion evidence. But, Plaintiff has not identified, and the Court is unaware of, any binding case law demanding an ALJ to specify how he analyzed these factors individually.   While including a thorough assessment of each factor might be helpful in assisting a claimant to better understand the ALJ's decision, the text of the regulation only requires that the ALJ "consider" all of the factors. *Id.*  It is well-established that an ALJ may consider evidence without expressly discussing it within his opinion. *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 507-08 (6th Cir. 2006). Specifically in regard to the treating source, the regulations only require the ALJ to provide " 'good reasons . . .  for the weight . . .  given to the treating source's opinion' –not an exhaustive factor-by-factor analysis." *Francis v. Comm'r of Soc. Sec.*, 414 F. App'x 802, 804 (6th Cir. 2011) (alterations in original).  Thus, Plaintiff's argument is not well-take.

## B.  State Agency Reviewing Psychologists

Plaintiff asserts that the ALJ erred in relying on the opinion of the state agency reviewing psychologist Dr. Dietz.  In September 2009, Dr. Dietz opined that Plaintiff could perform three-

and four-step tasks in an environment without high production demands or schedules. (Tr. 83, 452).  The ALJ assigned "great weight" to the opinion. (Tr. 83).

Plaintiff contends that the ALJ should not have assigned such weight, because Dr. Dietz did not have the completed medical record when conducting his review.  As an initial matter, the Court points out that Dr. Dietz's opinion was not the most recent state agency opinion of record. After reviewing the updated record in May 2010, Dr. Goldsmith affirmed Dr. Dietz's opinion. (Tr. 577).  The ALJ also attributed "great weight" to the opinion of Dr. Goldsmith. (Tr. 83).

Plaintiff cites *Blakley v. Commissioner*, 581 F.3d 399, 409 (6th Cir. 2009) in support of her argument regarding Dr. Dietz.  In *Blakley* the Sixth Circuit held that the ALJ's choice to attribute greater weight to the state agency physicians over the plaintiff's treating sources was reversible error because the consultants' opinions were based on an incomplete case record.  The Sixth Circuit remanded the case, in part, because the court "require[d] some indication that the ALJ at least considered" the effect of subsequent medical records on the reliability of the state agency assessments. *Id.* (quoting *Fisk v. Astrue*, 253, F. App'x 580, 585 (6th Cir. 2007)); *see* *Brooks v. Soc. Sec. Admin.*, 430 F. App'x 468, 482 (6th Cir. 2011).

Following *Blakley*, the Sixth Circuit indicated that "[t]here is no categorical requirement that the non-treating source's opinion be based on a 'complete' or 'more detailed and comprehensive' case record. The opinions need only be 'supported by evidence in the case record.' " *Helm v. Comm'r of Soc. Sec. Admin.*, 405 F. App'x 997, 1002 (6th Cir. 2011) (internal citations omitted).  In  *McGrew v. Comm'r*, 343 F. App'x 26, 30-32 (6th Cir. 2009) the Sixth Circuit found an ALJ's reliance on state agency medical opinions based on an incomplete record was proper, because the ALJ considered medical examinations after the state assessments and accounted for changes in the plaintiff's condition in the RFC.  In this case, the ALJ expressly

addressed much of the additional evidence post-dating the state agency opinions and acknowledged that the state agency opinions were generally supported by the record. (Tr. 81-82). The ALJ included within the RFC stricter limitations than those assigned by the state agency physicians, further demonstrating that he accounted for the post-dated evidence.

Additionally, this case is distinguishable from *Blakely* in light of its facts.  In *Blakely*, the ALJ failed to comply with the treating source rule in relation to three treating physicians, including ignoring one treating source's opinion altogether. *Blakley*, 581 F.3d at 407-08.  Here, the ALJ's opinion adequately explained why he gave less than controlling weight to Dr. Khan's opinion when determining the RFC.  An ALJ's unsupported rejection of a treating source and reliance on non-examining sources without full access to the record appeared to be the "overriding danger" that existed in *Blakely*, is not similarly present here. *See Curry v. Colvin*, 4:13-CV-00312, 2013 WL 5774028, at *17 (N.D. Ohio Oct. 24, 2013).

Plaintiff also asserts that the ALJ was required to provide "good reasons" for assigning great weight to Dr. Dietz's opinion.  However, Plaintiff points to no authority requiring the ALJ to justify his decision for attributing such weight to a state agency reviewing physician.

According to Plaintiff, the ALJ also erred by failing to apply the same level of scrutiny to the opinions of the state agency physicians as he did to the opinions issued by Drs. Khan and Patel.  She cites to *Gayheart v. Commmissioner of Social Security*, 710 F.3d 365, 375-76 (6th Cir. 2013) for the proposition that the ALJ may not apply greater scrutiny to a treating-source opinion than that applied to opinions issued by state agency reviewing physicians.  In *Gayheart*, the ALJ relied on the state agency reviewers' opinions over that of the treating source, but had failed to acknowledge stark inconsistencies between the state agency opinions and the record. *Id.* at 379-80.  For instance, the ALJ failed to mention that one state agency doctor changed his

24

testimony from opining that the claimant met Listing 12.06, to later stating there was insufficient evidence to show a mental listing was met or equaled. *Id.* at 379.  Here, Plaintiff shows no such stark inconsistencies between the state agency opinions and the record.  Such inconsistencies do exist, however, in regard to treating physician Dr. Khan's opinion.  Accordingly, the present case is distinguishable from the facts in *Gayheart.*  Additionally, Dr. Patel is a one-time examining physician, not a treating source, and as such, *Gayheart* is inapplicable.

Finally, Plaintiff cites *Shelman v. Heckler*, 821 F.2d 316, 321 (6th Cir. 1987) for the proposition that the opinion of a non-examining physician is entitled to only little weight if it is contrary to the opinion of a treating physician.  Plaintiff's characterization of *Shelman* requires some further clarification.  In *Shelman* the Sixth Circuit began by explaining that an ALJ is not bound by the finding of a claimant's treating source when the opinion lacks sufficient support from medical data. *Id.* at 320-21.  However, the court went on observe that the ALJ failed to make a finding that the plaintiff's treating sources were unsupported by objective medical evidence. *Id.* at 321.  Because the ALJ did not explain why the treating physician was rejected, the Sixth Circuit found it unreasonable for the ALJ to credit a non-examining physician's opinion over that of a treating source. *Id.*; *see Gholston v. Comm'r Soc. Sec.*, No. 5:11-CV-1482, 2012 WL 4092811, at *7 (N.D. Ohio Sept. 17, 2012) (*citing Brumett v. Comm'r of Soc. Sec.*, No. 1:07-CV-955, 2009 WL 690250, at *8 (S.D. Ohio Mar. 11, 2009)).  Here, unlike in *Shelman*, the ALJ found Dr. Shah's opinion was not entitled to controlling weight and his opinion adequately met the goal of the treating source doctrine.  Thus, the ALJ reasonably accorded great weight to the opinions of the state agency reviewers.

### C. One-Time Physical Consultative Examiner

As to consultative examiner Dr. Patel, Plaintiff argues that the ALJ failed to give "good reasons" for assigning "little weight" to the doctor's opinion. Dr. Patel examined Plaintiff on one occasion in July 2009. (Tr. 380-81). It is well-settled that the opinions of a one-time examining physician are not entitled to any special level of deference. *Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994). The rationale of the treating physician rule simply does not apply to the opinions of one-time examiners. *Id.* Hence, the ALJ did not have to provide "good reasons" for the weight assigned to Dr. Patel's opinions. Nonetheless, the ALJ indicated why he did not accept the doctor's opinion in total.

The ALJ did not fully credit Dr. Patel because the doctor based much of his opinion on Plaintiff's subjective complaints. (Tr. 83). A review of the doctor's report shows Dr. Patel significantly grounded his recommendation on Plaintiff's self-reports. Dr. Patel opined: "I believe these debilitating migraines cause difficulty with [Plaintiff] being employed; however, if she were able to get better control of this issue, she would be able to perform a desk job." (Tr. 381). In formulating this opinion, Dr. Patel relied on Plaintiff's report that she experienced migraines "her whole life, 2-3 per week." (Tr. 380). The ALJ concluded that Plaintiff's statements were highly unreliable, drawing into question Dr. Patel's opinion.

Plaintiff also asserts that she should have been limited to sedentary work, because Dr. Patel recommended a "desk job." Plaintiff asserts that this physical limitation was supported by the findings of Dr. Patel's physical examination. The examination showed decreased range of motion in Plaintiff's knees and shoulders, decreased strength in both shoulders, and decreased strength in the right knee. (Tr. 381). Assuming that Dr. Patel intended to recommended sedentary work by his reference to a "desk job," the ALJ's discussion of other medical evidence

undermines Dr. Patel's findings.  Both state agency reviewing physicians Drs. Hill and McCloud opined that Plaintiff could perform more than sedentary work. (Tr. 83).  Further, the ALJ recounted Plaintiff's conservative treatment during the relevant period of steroid injections and her failure to attend physical therapy, though he acknowledged that in 2011, Plaintiff was referred to an orthopedic surgeon. (Tr. 77).

Furthermore, even if the ALJ erred in failing to credit Dr. Patel's recommendation of a desk job, remand for further proceedings on this ground would be futile.  During the administrative hearing, the VE identified jobs that Plaintiff could perform at the sedentary level of physical exertion with the same mental limitations included in the controlling RFC. (Tr. 127).  For example, the VE identified the following sedentary positions: surveillance systems monitor, inspector, polisher, and lens inserter. (Tr. 128).  It follows that remand based on this allegation of error would result in no different outcome, as jobs exist in significant numbers in the national economy that Plaintiff could perform with a limitation to sedentary work. *See Kobetic v. Comm'r of Soc. Sec.*, 114 F. App'x 171, 173 (6th Cir. 2004) (When "remand would be an idle and useless formality," courts are not required to "convert judicial review of agency action into a ping-pong game.") (*quoting NLRB v. Wyman-Gordon Co.*, 394 U.S. 759, 766, n. 6, 89 S.Ct. 1426, 22 L.Ed.2d 709 (1969)).

### D.  Examining Physician Dr. Shah

Regarding Dr. Shah, Plaintiff maintains that the ALJ "grossly mischaracterized" the doctor's treatment records.  More specifically, Plaintiff asserts that the ALJ improperly supported the RFC by citing to x-rays of Plaintiff's knees that showed mild to moderate narrowing of the medial compartment (Tr. 77), but omitted a discussion of Plaintiff's severe patellofemoral degenerative joint disease found by Dr. Shah in four view x-rays.  She argues that

the ALJ was required to give good reasons for why her bilateral severe patellofemoral arthritis did not prevent her from performing light work.

Plaintiff's arguments lacks merit.  The ALJ was correct in observing that on September 21, 2011, Dr. Shah opined that x-rays of Plaintiff's knees showed mild to moderate narrowing of the medial compartment. (Tr. 747-49).  The ALJ did not go on to also acknowledge that x-rays showed severe patellofemoral joint degenerative disc disease. (Tr. 749).  Even so, the ALJ's failure does not warrant remand.  It is well-settled that the ALJ is not required to discuss every piece of evidence in the record; an ALJ "can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party." *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 507-08 (6th Cir. 2006); *Dennis v. Comm'r of Soc. Sec.*, 779 F. Supp. 2d 727, 731 (E.D. Mich. 2011).  The ALJ acknowledged that Plaintiff suffered from degenerative joint disease.  The ALJ expressly noted Dr. Shah's treatment in October 13, 2011 where the doctor referred Plaintiff to an orthopedic surgeon for her patellofemoral condition, because of its severity and her lack of response to conservative treatment. (Tr. 77).  Thus, the ALJ's opinion shows that he did not ignore evidence of Plaintiff's severe degenerative joint disease.

Furthermore, Plaintiff cites to no authority indicating that the ALJ has an obligation to give good reasons as to why a particular diagnosis does not result in disability.  The mere diagnosis of a condition does not speak to its severity or indicate the functional limitations caused by the ailment.  *See Young v. Sec'y of Health & Human Servs.*, 925 F.2d 146, 151 (6th Cir. 1990).  As a result, the fact that Dr. Shah diagnosed Plaintiff with severe patellofemoral degenerative joint disease is not enough to show that the condition was disabling.  Accordingly, Plaintiff's allegation of error does not warrant remand.

### E.  The ALJ's Formulation of the RFC

Finally, Plaintiff claims that the ALJ cannot create the RFC independent of the medical evidence contained in the record.  Plaintiff further asserts that the ALJ acted inappropriately in formulating the RFC because none of the state physicians who reviewed the claim provided a medical opinion anywhere near the RFC stated by the ALJ.

Plaintiff's arguments are not well founded.  The ALJ assessed all of the medical opinion evidence, along with other evidence relevant to Plaintiff's claim.  The ALJ did not formulate the RFC while ignoring opinions from medical sources.  What is more, the ALJ's RFC varied from those of the state agency physicians in that it was more restrictive.

Simply because the ALJ's RFC deviates from medical opinions in the record, does not lead to the conclusion that he has acted inappropriately.  As Plaintiff notes the ALJ is to assess the "residual functional capacity based on all of the relevant medical *and other evidence*." *See* 20 C.F.R. § 404.1545(a) (emphasis added).  It is the ALJ's prerogative to weight the medical evidence, testimony, daily activities, and other evidence in the record, and based on that evaluation, to formulate the RFC.  The ALJ does not act as medical expert by doing so.  Given that the ALJ's RFC is supported by substantial evidence, remand is inappropriate.

### VII.  DECISION

For the foregoing reasons, the Magistrate Judge finds that the decision of the Commissioner is supported by substantial evidence.  Accordingly, the Court AFFIRMS the decision of the Commissioner.

IT IS SO ORDERED.

s/ Kenneth S. McHargh
Kenneth S. McHargh
United States Magistrate Judge

Date:  June 11, 2014.